**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In re:

CELL C PROPRIETARY LIMITED,

Debtor in a foreign proceeding.

Case No. 17-11735 (MG)
Chapter 15

**MEMORANDUM OPINION AFTER RECOGNITION OF FOREIGN MAIN
PROCEEDING PENDING IN THE HIGH COURT OF SOUTH AFRICA AND
RECOGNITION AND ENFORCEMENT OF SOUTH AFRICAN SCHEME OF
<u>ARRANGEMENT</u>**

*A P P E A R A N C E S:*

NORTON ROSE FULBRIGHT US LLP
*Attorneys for the Foreign Representatives*
2200 Ross Avenue, Suite 3600
Dallas, TX 75201-7932
By:   Kristian W. Gluck, Esq.

**MARTIN GLENN**
**UNITED STATES BANKRUPTCY JUDGE**

On July 14, 2017, this Court entered an order recognizing as a foreign main proceeding a case pending in the High Court of South Africa (the "South African Court") commenced by Cell C Proprietary Limited ("Cell C"), the foreign debtor in this Chapter 15 case.  (ECF Doc. # 30.) On July 18, 2017, the South African Court approved, or "sanctioned," the scheme of arrangement ("Arrangement") that Cell C negotiated with, and was overwhelming approved by a vote of, certain classes of its financial creditors ("Compromise Creditors").  On July 20, 2017, this Court entered an order recognizing and enforcing the Arrangement.  (ECF Doc. # 48.)  No objections were raised in this Court either to recognition of the South African Court proceeding as a foreign main proceeding or the recognition and enforcement of the Arrangement.  This Opinion explains the reasons for the two orders entered by this Court.

Cell C's foreign representatives filed an application (the "Application," ECF Doc. # 7) for the entry of an order recognizing certain proceedings in South Africa as a foreign main proceeding, or in the alternative, as a foreign non-main proceeding. The Application was supported by the declaration of Paulo Pianezze (the "Pianezze Declaration," ECF Doc. # 9), a foreign representative in this case, along with Robert Killigrew Sabine Pasley, and Graham Mackinnon, who together are the "Foreign Representatives." On July 3, 2017, the Foreign Representatives filed a supplemental declaration (the "Supplemental Declaration," ECF Doc. # 21), indicating that the Compromise Creditors had voted overwhelmingly in favor of the proposed Arrangement. (*See* "Arrangement," ECF Doc. # 9-3.) It also indicated that the South African Court was scheduled to hold a hearing on July 18, 2017, to determine whether to sanction the Arrangement. A separate declaration filed by Haroon Yusuf Laher (the "Laher Declaration," ECF Doc. # 8), counsel for the Foreign Representatives, provides additional detail on the nature of the ongoing proceedings in South Africa (the "Section 155 Proceeding"). Laher filed a supplemental declaration (the "Second Laher Declaration," ECF Doc. # 27) on July 12, 2017, relating to the *Edcon Holdings Limited* case, cited below, specifically with respect to service of process in South Africa.

The Foreign Representatives also filed a motion (the "Comity Motion," ECF Doc. # 11) to enter an order recognizing and granting comity for the South African Court's order sanctioning the Arrangement (the "Sanction Order," ECF Doc. # 31, Ex. A). As already stated, the South African Court granted the Sanction Order and approved the Arrangement on July 18, 2017; this Court granted the the Comity Motion and recognized and enforced the Arrangement on July 20, 2017.

# I. BACKGROUND

## A. Cell C's Business

Cell C is the third largest of four mobile network operators in South Africa, and began commercial operations in November of 2001. (Application at 6.) Cell C is 100% owned by 3C Telecommunications Proprietary Limited ("3C Telecommunications"), a South African company. (*Id*. at 4.) 3C Telecommunications, in turn, is 75% owned by Oger Telecom Limited ("OTL"), a company registered in accordance with the laws of the Dubai International Financial Centre in the United Arab Emirates. (*Id*. at 4–5.) Essentially all of Cell C's operations and decision-making occurs in South Africa: Cell C is headquartered in South Africa, it is organized under the laws of South Africa, the majority of its employees and assets are located in South Africa, and substantially all of Cell C's major customers are located in South Africa. (*Id*. at 6.)

Cell C offers mobile voice and data communication services and a range of devices to its customers, which include individuals, businesses, and the South African government. (*Id*.) Cell C's major creditors include the Compromise Creditors and creditors not affected by the Section 155 Proceeding. These other creditors are China Development Bank Corporation ("CDB"), the Industrial and Commercial Bank of China Limited ("ICBC"), Nedbank Limited ("Nedbank"), and Development Bank of Southern Africa Limited ("DBSA"). The Compromise Creditors, which are the holders of the Euro 400,000,000 8.625% first priority senior secured notes due 2018 (the "Euro Notes") issued by Cell C, and governed by New York law pursuant to the underlying indenture (the "Indenture"). (*Id*. at 5; *see also* ECF Doc. ## 45, 49 (operative indenture and supplements).)

After pursuing an aggressive pricing strategy against its competitors for a few years, it became clear to Cell C in 2014 that additional equity would be required in the business.

3

(Application at 7.) The company attempted to identify new sources for equity, either through an outright disposal of Cell C's equity or through a combined transaction involving OTL and a new equity investor, but this process was ultimately unsuccessful. (*Id.* at 7–8.)

On November 20, 2016, Cell C failed to make a capital payment due to CDB, which was an event of default under the related facility agreement. (*Id.* at 8.) This default resulted in cross defaults under other facilities with ICBC, Nedbank, and DBSA. (*Id.*) On January 1, 2017, Cell C failed to pay an interest payment due to the Compromise Creditors. (*Id.*) Cell C then turned to the debt restructuring process provided for under South African law.

### B.    Section 155 of the Companies Act

The South African Companies Act 71 of 2008 (the "Companies Act") at Section 155 provides for a process to approve an "arrangement" or "compromise" that may affect some or all of a company's creditors. (Laher Declaration at 2.) In a Section 155 proceeding, the "debtor" or "applicant" proposes an arrangement to its affected creditors, the creditors vote on the arrangement, and if the requisite votes are obtained, the debtor petitions the South African Court for a "sanction order" approving, or "sanctioning," the arrangement. (*Id.* at 2–3.)

To commence the compromise process, a board of directors of a company must propose a restructuring of its financial obligations to all of its creditors, or to all of the members of any class of its creditors, by delivering a copy of the compromise proposal and notice of the meeting to consider such proposal to all its creditors, or to every member of the relevant class of creditors and to the Companies and Intellectual Property Commission[1] (the "Commission"). (*Id.* at 3–4.)

The compromise proposal is deemed adopted by the creditors, or the members of a relevant class of creditors, if it is supported by a majority in number, representing more than 75%

---

[1] The Commission is a state institution which has jurisdiction over certain limited affairs of South African companies, similar to the United Kingdom Companies House. (*Id.* at 4.)

in value, of the creditors or class (as the case may be) present and voting in person or by proxy at a meeting called for that purpose. (*Id.*) If the affected creditors duly adopt the compromise proposal, the company thereafter may apply to the South Africa Court for an order sanctioning the compromise. (*Id.*) The court may then sanction a compromise if the court considers it "just and equitable" to do so. (*Id.*)

Through the Section 155 Proceeding, Cell C sought to accomplish two main goals, utilizing both debt and equity restructuring mechanisms. First, the debt restructure component of the reorganization reduces Cell C's financial indebtedness (mainly denominated in foreign currency and consequently exposed to currency fluctuations) from a level of approximately R24 billion to approximately R6 billion and it also introduces fresh capital into the business through Blue Label Telecoms Limited ("Blue Label") and Net 1 UEPS Technologies Inc. ("Net 1") as equity partners in Cell C. (Application at 10–11.) Second, as part of an equity restructuring, Blue Label will acquire a 45% equity stake in Cell C and Net 1 will acquire 15%, and Cell C staff and management will acquire 10% of Cell C. (*Id.* at 11.) 3C Telecommunications, an existing owner of 100% of the equity in Cell C, will dilute and subscribe indirectly for new equity of 30% in Cell C through several special purpose vehicles. (*Id.*)

    **C.**    **The Terms of the Arrangement**

As set forth in the Arrangement, its purpose "is to enable Cell C, insofar as is possible, to continue operating its business on a solvent basis, as a going concern in the ordinary course, taking into account the circumstances and facts available to the Board [of directors] as at the date of this Arrangement. As such if the Arrangement is adopted by the requisite majority of a meeting of the Compromise Creditors and sanctioned by a Court, and the restructure is completed and implemented, Cell C will be able to continue operating its business in the

5

ordinary course." (Arrangement § 4.13(2)).  However, "[i]f Cell C were to be placed into liquidation at this point in time, the Compromise Creditors, with CDB and ICBC, as secured creditors, will receive a minimal dividend in respect of the amounts owing to them.  No other creditor, including DBSA, Nedbank and ordinary trade creditors, all of whom are unsecured, will receive a dividend in liquidation."  (*Id.* § 1.4.)

The financial restructure of the Compromise Creditors' claims pursuant to the Arrangement involves the following:

> (2A)  on the Closing Date Cell C will pay or cause to be paid and the [Compromise Creditors] will receive in exchange for their listed Euro Notes and in discharge of the Compromise Creditors' Claims:
>
> (a) a cash payment of the accrued but unpaid interest of EUR17.25 million (Interest Payment);
>
> (b) a cash payment of the EUR equivalent of Rand 262 million (converted at the Agreed Close Rate) in respect of capital (the "Day 1 Prepayment");
>
> (c) a new 3-year Irish stock exchange listed bond issued by Cell C, in the USD equivalent of Rand 2.397 million (converted at the Agreed Close Rate) (the "New Cell C Bond");
>
> (d) a new 5-year bond issued by SPV1 (the "SPV1 Bond"), in the USD equivalent of the difference between (i) the Compromise Creditors' Claims (outstanding as at the date of this Arrangement and Closing Date) minus (ii) the Interest Payment minus (iii) the Day 1 Prepayment minus (iii) the Deferred Prepayment (see 4.9(2B) below) minus (iv) the nominal value of the New Cell C Bonds (all converted at the Agreed Close Rate) (the "SPV1 Bonds Nominal Value") (and SPV1 shall have as its only asset 11.8% of the total issued share capital of Cell C); …

(*Id.* § 4.9(2A).)

The Arrangement provides that "Cell C will be released from the payment of any amount owing to the Compromise Creditors.  Its obligations in that regard will be restructured

6

on the terms of this Arrangement." (*Id*. § 4.12(1); *see id.* § 4.13(1) ("Cell C will be fully and finally released from the obligation to discharge its liabilities to the Compromise Creditors.").) This means that Cell C will no longer have any liabilities to the Compromise Creditors under the Euro Notes, but will have liabilities to the Compromise Creditors under the Arrangement, including those representing payments in cash and pursuant to the New Cell C Bonds and SPV1 Bonds.

### D. Procedural Background

#### 1. The Section 155 Proceeding

On June 21, 2017, Cell C sent out to its creditors a "Notice of the Compromise Creditors Meeting," providing notice to affected creditors of a "Compromise Creditors Meeting" pursuant to Section 155 of the Companies Act to approve the Arrangement. (*Id*.) The Compromise Creditors Meeting took place on June 28, 2017, and all of those in attendance, roughly 98% of the Compromise Creditors, voted in favor of the proposed scheme. (Supplemental Declaration at 3.) The Arrangement was approved by more than three-quarters by value of holders of Euro Notes present at the Compromise Creditors Meeting as required by the Companies Act. (*Id*.)

Also on June 21, 2017, Cell C issued a board resolution (the "Board Resolution," ECF Doc. # 9, Ex. 1) appointing the Foreign Representatives and authorizing them to file a chapter 15 case in the United States. (Application at 10.) On June 30, 2017, Cell C applied to the South African Court for a Sanction Order approving the Arrangement. (*Id*.) On July 18, 2017, the South African Court held a hearing and entered the Sanction Order approving the Arrangement. (*See* Sanction Order.)

7

2.  *The Preliminary Injunction*

On June 22, 2017, the date the chapter 15 petition was filed, the Court entered an order to show cause (the "OSC," ECF Doc. # 15) and a temporary restraining order ("TRO"), which provided the following:

a.  all persons and entities subject to this Court's jurisdiction are temporarily restrained from taking or continuing any act to seize, attach, possess, execute upon, exercise control over and/or enforce liens against any assets of the Debtor located in the territorial jurisdiction of the United States; and

b.  the automatic stay set forth in Section 362 of the Bankruptcy Code shall be applicable, within the territorial boundaries of the United States, to the Debtor and all of its assets.

(OSC at 5.) The OSC also ordered all parties in interest to show cause why essentially identical relief should not be entered pursuant to a preliminary injunction. (*Id.* at 3.) No objections or responses to the OSC or the relief requested therein were filed, and on July 6, 2017, the Court entered the "Preliminary Injunction Order."[2] (ECF Doc. # 24.) On June 30, 2017, Cell C applied to the South African Court for a Sanction Order approving the Arrangement. (Application at 10.)

3.  *Notice of the Recognition Hearing and Comity Motion*

All creditors affected by the Arrangement received notice of the proceedings in this chapter 15 case. Cell C has filed a "Service List" (*see* ECF Doc. # 14), which includes, among others, a "Bondholders' Committee" primarily comprised of the Compromise Creditors. This Service List also appears as Exhibit A to an affidavit of service of all of the primary documents

---

[2] When this Court issued the TRO, the Court did not understand that that the court proceeding in South Africa had not yet been filed. Unlike a scheme of arrangement in the United Kingdom, where a court proceeding is first filed and a court order convening a creditors meeting to vote on the proposed scheme is obtained, a Section 155 proceeding permits the company to send notice and a description of the proposed arrangement to affected creditors, conduct the creditors meeting and obtain a creditor vote, and only then if the required votes are obtained, file a proceeding in the South African Court. The South African Court proceeding with respect to Cell C had been filed before the Preliminary Injunction Order was issued. The Court reserves for another day in another case the issue whether it is appropriate to issue a TRO *before* the foreign court proceeding is filed.

8

in the case. (*See* ECF Doc. # 17.) A hearing in this Court on the Comity Motion occurred on July 20, 2017, with a similar noticing process, during which the Court granted the Comity Motion.

### E. Cell C's United States Assets

Cell C does not have a place of business or domicile in the United States, but it has a retainer in the Norton Rose Fulbright US LLP Iolta Trust account, located at Citibank, N.A. in New York, New York. (Application at 15.) Additionally, the Euro Notes issued by Cell C are governed by New York law and contain a New York forum selection clause. (*Id*.; *see also* ECF Doc. ## 45, 49.)

## II. LEGAL STANDARDS

### A. Requirements for Recognition of a Foreign Proceeding

Section 1517(a) of the Bankruptcy Code provides that the court shall, after notice and a hearing, enter an order recognizing a foreign main proceeding if:

> (1) such foreign proceeding for which recognition is sought is a foreign main proceeding . . . within the meaning of section 1502;
>
> (2) the foreign representative applying for recognition is a person or body; and
>
> (3) the petition meets the requirements of section 1515.

11 U.S.C. § 1517(a). "While not explicit in this section, the foreign proceeding and the foreign representative must meet the definitional requirements set out in sections 101(23) and 101(24)." 8 COLLIER ON BANKRUPTCY ¶ 1517.01 (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2014).

9

*1.    Requirements of a Foreign Proceeding and Foreign Main Proceeding*

A foreign proceeding is a "collective judicial or administrative proceeding in a foreign country, including an interim proceeding, under a law relating to insolvency or adjustment of debt in which proceeding the assets and affairs of the debtor are subject to control or supervision by a foreign court, for the purpose of reorganization or liquidation." 11 U.S.C. § 101(23); *see also In re ABC Learning Ctrs. Ltd.*, 445 B.R. 318, 327 (Bankr. D. Del. 2010). The foreign representative must satisfy seven criteria to establish that a proceeding is a foreign proceeding:

> (i) [the existence of] a proceeding; (ii) that is either judicial or administrative; (iii) that is collective in nature; (iv) that is in a foreign country; (v) that is authorized or conducted under a law related to insolvency or the adjustment of debts; (vi) in which the debtor's assets and affairs are subject to the control or supervision of a foreign court; and (vii) which proceeding is for the purpose of reorganization or liquidation.

*In re Ashapura Minechem Ltd.*, 480 B.R. 129, 136 (S.D.N.Y. 2012) (footnote omitted).

A foreign main proceeding, defined as "a foreign proceeding in the country where the debtor has the center of its main interest," 11 U.S.C § 1502(4), and "shall be recognized . . . if it is pending in the country where the debtor has the center of its main interests." *Id.* § 1517(b)(1). Although the term "center of main interests" ("COMI") is not defined in the Bankruptcy Code, "[i]n the absence of evidence to the contrary, the debtor's registered office . . . is presumed to be the center of the debtor's main interests." *Id.* § 1516(c); *see also In re Bear Stearns*, 374 B.R. 122, 130 (Bankr. S.D.N.Y. 2007).

To determine a debtor's COMI, courts in this circuit look to a nonexclusive list of factors, including "the location of the debtor's headquarters; the location of those who actually manage the debtor . . . ; the location of the debtor's primary assets; the location of the majority of the debtor's creditors or of a majority of the creditors who would be affected by the case; and/or the jurisdiction whose law would apply to most disputes." *Morning Mist Holdings Ltd. v. Krys (In*

10

*re Fairfield Sentry Ltd.)*, 714 F.3d 127, 137 (2d Cir. 2013) (quoting *In re SPhinX, Ltd.*, 351 B.R. 103, 117 (Bankr. S.D.N.Y. 2006)).

2.  *Requirements of a Foreign Representative*

A foreign representative is "a person or body, including a person or body appointed on an interim basis, authorized in a foreign proceeding to administer the reorganization or the liquidation of the debtor's assets or affairs or to act as a representative of such foreign proceeding." 11 U.S.C. § 101(24). "Person" is defined under section 101(41) of the Bankruptcy Code to include an individual, partnership, or corporation. 11 U.S.C. § 101(41).

In *In re Vitro S.A.B. de CV*, the Fifth Circuit concluded that section 101(24) does not require that a foreign representative be appointed by a foreign tribunal. The court looked to the "plain meaning" of the statute and noted that "[s]ection 101(24)—defining the term 'foreign representative'—is wholly devoid of any statement that a foreign representative must be judicially appointed." *Ad Hoc Group of Vitro Noteholders v. Vitro S.A.B. de CV (In re Vitro S.A.B. de CV)*, 701 F.3d 1031, 1047 (5th Cir. 2012). The court also looked to the history of Model Law Article 2(d), containing language which is closely followed by section 101(24), which "expressly rejected the requirement that a foreign representative be '[specifically] authorized by statute or other order of court (administrative body) to act in connection with a foreign proceeding.'" *Id*. (citation omitted). The court held that a governing body of an entity may authorize a person to act as that entity's foreign representative in a chapter 15 proceeding. *Id*.

3.  *Requirements of Section 1515*

The requirements provided by section 1515 include that a petition for recognition be filed and accompanied by:

>  (1) a certified copy of the decision commencing the foreign proceeding and appointing the foreign representative;
>
>  (2) a certificate from the foreign court affirming the existence of the proceeding and appointment of the representative; or
>
>  (3) in the absence of (1) or (2), evidence which the court deems sufficient to confirm the existence of the foreign proceeding and appointment of the foreign representative.

11 U.S.C. § 1515(a)–(b). The petition must also be accompanied by a statement identifying all known foreign proceedings with respect to the debtor, *id.* § 1515(c), and if applicable, a translation of the evidentiary materials into English. *Id.* § 1515(d).

### B.     The Interplay of Section 109(a) and Chapter 15 of the Bankruptcy Code

Section 109(a) provides that "[n]otwistanding any other provision of this section, only a person that resides or has a domicile, a place of business or property in the United States, or a municipality, may be a debtor under this title." *Id.* § 109(a). The Second Circuit has applied the requirements enumerated in section 109(a) of the Bankruptcy Code to debtors under chapter 15. *See Drawbridge Special Opportunities Fund LP v. Barnet (In re Barnet)*, 737 F.3d 238, 247 (2d Cir. 2013). Accordingly, under section 109(a) and in accordance with *Barnet*, a foreign representative must show that the debtor has either (i) a domicile, (ii) a place of business, or (iii) *property* in the United States, as a condition precedent to eligibility under 11 U.S.C. § 1517. *See In re Barnet*, 737 F.2d at 247; *In re Octaviar Admin. Pty. Ltd.*, 511 B.R. 361, 369 (Bankr. S.D.N.Y. 2014). Some courts, including this Court, have held that a retainer in a United States bank account constitutes property in the United States. *See, e.g.*, *In re Inversora Eléctrica de Buenos Aires S.A.*, 560 B.R. 650, 654 (Bankr. S.D.N.Y. 2016) ("This Court has found that an undrawn attorney retainer held in a United States bank account provides a sufficient basis for jurisdiction.") (citing *In re Berau Cap. Res. Pte Ltd*, 540 B.R. 80, 82 (Bankr. S.D.N.Y. 2015)); *In*

12

*re Octaviar*, 511 B.R. at 372–73 ("There is a line of authority that supports the fact that prepetition deposits or retainers can supply 'property' sufficient to make a foreign debtor eligible to file in the United States.") (*citing In re Cenargo Int'l PLC*, 294 B.R. 571, 603 (Bankr. S.D.N.Y. 2003)); *see also In re Yukos Oil Co.*, 321 B.R. 396, 401–03 (Bankr. S.D. Tex. 2005); *In re Global Ocean Carriers Ltd.*, 251 B.R. 31, 39 (Bankr. D. Del. 2000).

Courts have also held that debt subject to New York governing law and a New York forum selection clause constitutes property in the United States. *See In re Inversora*, 560 B.R. at 655 ("[D]ollar-denominated debt subject to New York governing law and a New York forum selection clause is independently sufficient to form the basis for jurisdiction.") (citation omitted); *In re Berau Cap.*, 540 B.R. at 84 ("The Court concludes that the presence of the New York choice of law and forum selection clauses in the Berau indenture satisfies the section 109(a) 'property in the United States' eligibility requirement.") (footnote omitted).

### C.    Standards for Recognition and Enforcement

Upon recognition of a foreign proceeding, at the request of the foreign representative, the Court may grant, with certain express exceptions, "any appropriate relief," including "any additional relief that may be available to a trustee" that the Court determines is necessary to effectuate the purpose of chapter 15 and to protect the assets of the debtor or the interests of the creditors. 11 U.S.C. § 1521(a)(7). Appropriate relief under section 1521 includes enforcing a foreign confirmation order. *See In re Rede Energia S.A.*, 515 B.R. 69, 89 (Bankr. S.D.N.Y. 2014). Relief under section 1521 will be granted "only if the interests of the creditors and other interested entities, including the debtor, are sufficiently protected." *Id*. at 90; 11 U.S.C. § 1522(a).

13

In addition to the types of relief enumerated in section 1521, section 1507(a) of the Bankruptcy Code provides that "[s]ubject to the specific limitations stated elsewhere in this chapter[,] the court, if recognition is granted, may provide additional assistance to a foreign representative under this title or under other laws of the United States." *Id*. § 1507(a). "Pursuant to section 1507, the court is authorized to grant any 'additional assistance' available under the Bankruptcy Code or under 'other laws of the United States,' provided that such assistance is consistent with the principles of comity and satisfies the fairness considerations set forth in section 1507(b)." *In re Rede Energia S.A.*, 515 B.R. at 90. As with section 1521, relief under section 1507 may include recognition and enforcement of a plan approved by a foreign court. *Id.* at 94–95.

### III.    DISCUSSION

Chapter 15 of the Bankruptcy Code is designed to allow a U.S. court to assist the administration of a foreign proceeding in its goal to protect and maximize the value of a debtor's assets and to facilitate the rehabilitation of financially distressed businesses. The relief afforded to a foreign debtor under chapter 15 is intended to avoid disruptions that could otherwise derail a debtor's restructuring in its home country.

The Court now holds that: (i) the Section 155 Proceeding is a foreign proceeding under the definition of 11 U.S.C. § 101(23), (ii) the Foreign Representatives are foreign representatives under the definition of 11 U.S.C. § 101(24) and each is a "person" under the definition of 11 U.S.C. § 101(41), and (iii) the petition for recognition meets the requirements of Section 1515, namely, the evidence in the record is sufficient to show the existence of a foreign proceeding and the appointment of foreign representatives. Accordingly, the requirements for recognition of the Section 155 Proceeding as a foreign proceeding are met and the recognition of the Section 155

14

Proceeding as a foreign main proceeding furthers the goals of chapter 15. Additionally, the recognition and enforcement of the Sanction Order is "appropriate relief" under sections 1521 and 1507.

### A. Cell C is Eligible to be a Debtor Under Section 109(a)

As a preliminary matter, a foreign representative must show that the debtor has either (i) a domicile, (ii) a place of business, or (iii) *property* in the United States, as a condition precedent to eligibility under 11 U.S.C. § 1517. *See In re Barnet* 737 F.2d at 247; *In re Octaviar*, 511 B.R. 361, 369 (Bankr. S.D.N.Y. 2014).

Here, Cell C does not have a place of business or domicile in the United States. However, Cell C has property in the United States. Specifically, Cell C has a retainer in the Norton Rose Fulbright US LLP Iolta Trust account, located at Citibank, N.A. in New York, New York. Additionally, Cell C has issued the Euro Notes which are governed by New York law and contain a New York forum selection clause. Both the retainer and the Euro Notes (governed by New York law) are "independently sufficient" bases for jurisdiction. *See In re Inversora*, 560 B.R. at 654–55; *In re Berau Cap.*, 540 B.R. at 82. Accordingly, Cell C satisfies the "property" requirement of section 109(a) of the Bankruptcy Code.

### B. Cell C Has Satisfied the Requirements of Section 1517

#### 1. *The Section 155 Proceeding is a Foreign Main Proceeding*

Cell C has shown that the Section 155 Proceeding is a foreign main proceeding. Cell C has satisfied the seven criteria of a foreign proceeding discussed in *In re Ashapura Minechem Ltd.*: (i) Cell C is proceeding with a proposal for a compromise and arrangement under Section 155 of the Companies Act and filed a petition with the South African Court seeking a Sanction Order; (ii) the proceeding is judicial in that Cell C sought, after notice and hearing, a Sanction Order to be signed by a South African Judge; (iii) the Section 155 Proceeding is collective in that

15

it seeks approval of an Arrangement, which is the adjustment of Cell C's debt with a group of creditors called the Compromise Creditors; (iv) the Section 155 Proceeding is pending in South Africa; (v) Section 155 of the Companies Act is a law that is related to insolvency or the adjustment of debts, and Cell C seeks to adjust its debts and reorganize in the Section 155 Proceeding; (vi) Section 155 of the Companies Act requires that the South African Court approve the Arrangement via a Sanction Order, and the South African Court may consider any objection asserted in respect of the Arrangement; and (vii) under the Companies Act, a debtor may reorganize or may liquidate and here Cell C is reorganizing. (Application at 17–18.) Additionally, the United States Bankruptcy Court for the Southern District of New York has previously recognized a South African section 155 proceeding as a foreign proceeding. *See In re Edcon Holdings Ltd.*, No. 16-13475 (Bankr. S.D.N.Y. Jan. 19, 2017).

Cell C has also shown that its COMI is in South Africa. South Africa is presumed to be Cell C's COMI because its registered office is located there. (Application at 5.) No evidence was presented to rebut the presumption and additional factors support this presumption, including the facts that Cell C is headquartered in South Africa, it is organized under the laws of South Africa, the majority of its employees and assets are located in South Africa, nearly all of its decision-making and operations take place in South Africa, and substantially all of its major customers are located in South Africa. (*Id.* at 6.) Therefore, the Section 155 Proceeding is recognized as a foreign main proceeding.

    *2.*    *The Foreign Representatives Are Qualified To Be Foreign Representatives*

The Foreign Representatives are individuals, satisfying section 101(41)'s definition of "person," and can therefore serve as foreign representatives. The Foreign Representatives have

been specifically authorized by Cell C's board of directors to act as its foreign representatives. (Board Resolution at 3.)

This Court agrees with the Fifth Circuit's analysis of section 101(24) in *In re Vitro S.A.B. de CV* that section 101(24) does not require that a foreign representative be judicially appointed. 701 F.3d at 1049 (holding that the foreign representatives were "not disqualified from serving as foreign representatives merely because they were not the subject of an official court appointment"). Other courts in this district have also recognized that a board of directors may authorize a person to act as the corporation's foreign representative in a chapter 15 proceeding. *See In re OAS S.A.*, 533 B.R. 83, 98 (Bankr. S.D.N.Y. 2015); *In re Compania Mexicana de Aviacion, S.A. de C.V.*, 2010 WL 10063842 (Bankr. S.D.N.Y. Nov. 8, 2010); *In re Edcon Holdings Ltd.*, No. 16-13475 (Bankr. S.D.N.Y. Jan. 19, 2017). The Board Resolution therefore satisfies the requirements of section 101(24) and shows that the Foreign Representatives are qualified to be the foreign representatives in this case.

        *3.*       *The Documents Filed by Cell C Satisfy the Requirements of Section 1515*

A petition for recognition was filed on June 22, 2017, but it was not accompanied by either a certified copy of the decision commencing such foreign proceeding, or a certificate from the foreign court affirming the existence of such foreign proceeding. Cell C asserts that the Board Resolution and the Pianezze Declaration satisfy the requirements of section 1515(b)(3).

The documents attached to the Pianezze Declaration and Supplemental Declaration satisfy the requirements of section 1515(b)(3), as these documents include: (i) a copy of the Board Resolution which shows both (a) the appointment of the Foreign Representatives and their authorization to file this chapter 15 case and (b) authorization to commence the Section 155 Proceeding; and (ii) a copy of a notice of motion filed on June 30, 2017, in the South African

17

Court, stating that Cell C will apply for the Sanction Order in the South African Court on July 18, 2017. (Board Resolution at 3; Supplemental Declaration Ex. A at 5)

The Court is satisfied with the evidence presented showing the existence of the foreign proceeding as of June 30, 2017, and of the appointment of the foreign representatives by the Cell C board of directors. The exhibits attached to the Pianezze Declaration and Supplemental Declaration establish that there is an ongoing proceeding in South Africa and that the Board Resolution fully authorized the Foreign Representatives to file this case.

Therefore, Cell C's petition meets the requirements of section 1515 of the Bankruptcy Code in satisfaction of the third requirement under section 1517(a). Because the petition satisfies section 1517, the Court recognizes Cell C's Section 155 Proceeding in this chapter 15 case.

### C. Recognizing the Section 155 Proceeding as a Foreign Main Proceeding Serves the Purposes of Chapter 15

Moreover, section 1508 of the Bankruptcy Code requires that courts "consider [the] international origin [of chapter 15] and the need to promote an application of [chapter 15] that is consistent with the application of similar statues adopted by foreign justifications." 11 U.S.C. § 1508. Here, the Compromise Creditors emphatically supported the Arrangement, which the South African Court then sanctioned. Importantly, but not surprisingly (given the near universal support for this reorganization), no objections to the relief sought by the Application were filed.

Accordingly, considerations of judicial cooperation and support for the foreign main proceeding in South Africa dictate that Cell C should be allowed to avail itself of the protections set forth under chapter 15, and obtain recognition as a foreign main proceeding.

### D. Recognizing and Enforcing the Sanction Order Is Warranted Under Sections 1521 and 1507

The recognition and enforcement of the Sanction Order is "appropriate relief" of a type not specifically enumerated in the non-exhaustive list set forth in section 1521(a). Additionally, courts have held that enforcing a foreign confirmation order falls within "appropriate relief." *See In re Rede Energia S.A.*, 515 B.R. at 89. Recognizing and enforcing the Sanction Order is appropriate for several reasons: (i) the Arrangement and Sanction Order only affect the Compromise Creditors and is not binding on any other party, (ii) no property of Cell C is being distributed under the Arrangement (Arrangement §§ 4.14–4.15), (iii) Compromise Creditors in the United States are protected against prejudice and inconvenience in the processing of claims in the Section 155 Proceeding as Compromise Creditors do not need to file claims to evidence their debt (*id.* § 3.30), (iv) no preferential or fraudulent disposition of property is being made (*id.* § 4.9(2B)), (v) the Arrangement does not violate the absolute priority rule, and (vi) the approval of the Sanction Order was adjudicated before the South African Court.

The concerns raised under section 1522 are not present here; the interests of the creditors and debtor are sufficiently protected if relief is granted under section 1521. An order enforcing the Sanction Order will permit Cell C, the Foreign Representatives, The Bank of New York Mellon ,and The Bank of New York Mellon (Luxembourg) S.A., to take the actions necessary to implement the Arrangement. Absent recognition and enforcement, the Arrangement may not be fully implemented as contemplated by and to the detriment of the parties, including the Compromise Creditors, who fully support the Arrangement.

Therefore, Cell C's request for enforcement of the Sanction Order in the United States is warranted under sections 1521 and 1507 of the Bankruptcy Code.[3]

### IV.    CONCLUSION

For the reasons discussed above, Cell C's South African Section 155 proceeding was recognized as a foreign main proceeding and the Sanction Order entered by the South African Court was recognized and enforced by this Court.

Dated:    July 27, 2017
         New York, New York

*Martin Glenn*
MARTIN GLENN
United States Bankruptcy Judge

---

[3] The Order recognizing and enforcing the Arrangement specifically provides that "[o]ther than the releases granted in favor of Cell C in the Arrangement, which are given full force and effect in the United States in Paragraph 2 of this Order, this Court has not been asked and is not giving full force and effect in the United States to any other releases in the Arrangement, including, without limitation, the third party releases described in Section 4.12(2)(b) and (c) of the Arrangement." (ECF Doc. # 48, ¶ 3.) Because the Court was not asked to recognize and enforce any third-party releases, it was unnecessary to consider the issues addressed by this Court in *In re Metcalfe & Mansfield Alternative Investments*, 421 B.R. 685 (Bankr. S.D.N.Y. 2015), and in *In re Sino-Forest Corp.*, 501 B.R. 655 (Bankr. S.D.N.Y. 2013).